UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 JUL 14 AM 11: 48

CLERK

BY_____
DEPUTY CLERK

TOP RIDGE INVESTMENTS, LLC,          )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )     Case No. 5:16-cv-76
                                     )
ANICHINI, INC., ANICHINI             )
HOSPITALITY, INC., ANICHINI RETAIL,  )
INC., and SUSAN DOLLENMAIER,         )
                                     )
          Defendants,                )
                                     )
and                                  )
                                     )
ROYAL HERITAGE HOUSE, LLC and        )
JEFFREY TAUBER,                      )
                                     )
          Defendants-in-Counterclaim.)

**OPINION AND ORDER**
**(Docs. 67, 68)**

This lawsuit arises out of a failed attempt by plaintiff Top Ridge Investments, LLC,

("Top Ridge") and counterclaim defendants Jeffrey Tauber and Royal Heritage House, LLC

("RHH") to acquire Anichini, Inc. and related companies (collectively "Anichini") and to hire

Anichini's principal, Susan Dollenmaier, as an executive in the reconstituted company. (*See*

Doc. 75 at 1.)

The action was originally filed in New York Supreme Court, County of New York, and

removed to the United States District Court for the Southern District of New York ("SDNY") on

the basis of diversity of citizenship. It was then transferred to the District of Vermont.

Plaintiff Top Ridge is a single purpose entity formed by RHH and Mr. Tauber to

purchase Anichini's commercial loan from People's United Bank, N.A. ("People's") (Doc. 75 at

7.) The loan is in default. (Doc. 68-1 ¶¶ 9, 10; Doc. 68-8 at 3.) Top Ridge seeks a judgment for

the amount due ($569,462.00 plus interest, late fees, and costs of collection) as well as a court order transferring all assets of Anichini, including an assignment of trademarks, to Top Ridge. (*See* Doc. 68 at 1–2; Doc. 76-1 ¶ 10.) It also seeks to enforce a personal guaranty against Ms. Dollenmaier. (Doc. 1-1, Complaint, ¶¶ 37–41.)

In response, Anichini and Ms. Dollenmaier have filed a counterclaim against Top Ridge and third-party claims against RHH and Mr. Tauber for declaratory relief, breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation, tortious interference, and breach of fiduciary duty.[1] (Doc. 26 at 9, 15–19.)

### Prior Rulings by the Court

On February 23, 2016, the New York Supreme Court issued an ex parte temporary restraining order ("TRO") enjoining Anichini from selling or otherwise transferring collateral except in the normal course of business pending a hearing on a motion for preliminary injunction. (Doc. 1-2.) The case was removed to the SDNY before the state court could hold a hearing on the preliminary injunction. The district court extended the TRO pending a hearing on the preliminary injunction.

On March 21, 2016, the SDNY granted a motion to transfer the case to the District of Vermont. The TRO was extended to April 1, 2016, to permit this court time to consider the motion for a preliminary injunction.

On May 23, 2016, this court held a hearing on the motion for a preliminary injunction. (Doc. 41.) Top Ridge sought an order requiring all collateral to be turned over to it by Anichini.

---

[1] RHH and Mr. Tauber were not parties to the original complaint. They were added as "Defendants-in-Counterclaim" in the Answer filed by Anichini and Ms. Dollenmaier. (Doc. 26.) Their addition to the case in the absence of a third-party complaint and independent service of process caused some initial dispute and confusion. They have now been served (Docs. 57, 58) and seek dismissal of the claims against them. (Doc. 67.)

Doc. 1-2. In a decision dated June 15, 2016, the court denied Top Ridge's motion for a preliminary injunction. Instead, the court issued a limited preliminary injunction consistent with the original TRO. The court's order enjoined Anichini from further encumbering or selling its assets except in the normal course of business. Anichini was also ordered to provide a monthly financial statement to Top Ridge. (Doc. 47.)

In October 2016, the parties returned to court when Top Ridge renewed its request for a more expansive preliminary injunction placing it in possession of the collateral. Following a hearing, the court concluded that little had changed since its original decision in June 2016 and continued the limited preliminary injunction in place. The court repeated its order requiring monthly financial statements. (Doc. 66.)

### Pending Motions

Two motions are now ripe for decision. These are Top Ridge's motion for summary judgment on its right to enforce the promissory note and other loan documents (Doc. 68) and RHH and Mr. Tauber's motion to dismiss Anichini's counterclaims (Doc. 67).

By order issued on March 1, 2017, the court placed the parties on notice that it would convert the motion to dismiss to a motion for summary judgment and would consider the materials submitted in connection with Top Ridge's motion for summary judgment. Both sides were allowed additional time to submit additional declarations or memoranda. (Doc. 77.)

### I.    Motion for Summary Judgment

#### A.    Legal Standard

A party is entitled to summary judgment only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when, under the substantive law, "it might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material

fact" is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"In deciding whether there is a genuine issue of material fact, [the court] must interpret all ambiguities and draw all factual inferences in favor of the nonmoving party." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Ford v. McGinnis,* 352 F.3d 582, 587 (2d Cir. 2003)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Fischl v. Armitage*, 128 F.3d 50, 56 (2d Cir. 1997) (quoting *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997)). On a motion for summary judgment, the court does not engage in credibility assessments, nor does it choose between conflicting versions of events or weigh the evidence; those are matters for the jury at trial. *See, e.g.*, Fed. R. Civ. P. 56(e) 1963 advisory committee note; *Anderson*, 477 U.S. at 255.

**B.  Positions of the Parties**

Top Ridge seeks a judgment against Anichini on the promissory note and against Ms. Dollenmaier on her personal guaranty. (Doc. 68 at 1–2.) In its statement of undisputed material facts, Top Ridge asserts that it purchased the loan documents, including the promissory note, security agreements, and personal guaranty, from People's in July 2015. (Doc. 68-1 ¶ 8.) Top Ridge states that the loan is secured by all personal property held by Anichini, including the rights to intangible assets, such as trademarks, trade names and contract rights. (*Id.* ¶ 4.) The security agreements contain terms preventing Anichini from asserting any setoff or counterclaim against the collateral as well as requiring notice of any claim against the lender. (*Id.* ¶ 7). Top Ridge asserts that the promissory note is in default and that it is entitled to foreclose on the collateral. (*Id.* ¶¶ 9–10.)

Ms. Dollenmaier and Anichini agree that they executed a promissory note and security agreements with Chittenden Bank in 2005.[2] (*Id.* at 1.) Ms. Dollenmaier agrees that she executed a personal guaranty. (*Id.* at 1–2.) They do not deny that Top Ridge purchased the loan and the lender's rights in the collateral from People's.

Ms. Dollenmaier and Anichini assert that Top Ridge's purchase of the loan was part of a larger transaction in which RHH would acquire Anichini, Ms. Dollenmaier and Anichini would be relieved of their bank debt and other obligations, and Ms. Dollenmaier would become a well-paid employee of a newly capitalized operation. (*See* Doc. 75-2 at 1–2 (citing Doc. 75-3 ¶¶ 14–38).) They contend that it is Top Ridge which is in breach of a contract to acquire Anichini on terms far more favorable to Ms. Dollenmaier than foreclosing on the collateral. They also make claims of breach of implied covenant of good faith and fair dealing, fraudulent misrepresentation, tortious interference with contractual relations, and breach of fiduciary duty. (Doc. 26 at 15–19.) Anichini and Ms. Dollenmaier argue that these defenses raise questions of fact sufficient to defeat Top Ridge's motion for summary judgment.

## C. Facts

Considered in the light most favorable to Ms. Dollenmaier and Anichini, the non-moving parties, the facts are:

Susan Dollenmaier founded the Anichini group of companies in New York in 1981 for the purpose of importing and selling high-end textiles, such as bed linens, to the luxury market. (*See* Doc. 75-3 ¶ 1.) Since 1986, Anichini has been based in Vermont, where it maintains its offices and a small retail store in Quechee. (Doc. 75-3 ¶¶ 2, 11.) Over the years the company grew. At its peak, Anichini employed more than 80 people and had annual sales in excess of

---

[2] Chittenden Bank later merged with People's.

$18 million. (*Id.* ¶ 6.) Anichini was hit hard by the recession in 2008 and has experienced financial difficulties since then. (*Id.* ¶¶ 7–10.) In 2005, Anichini and Ms. Dollenmaier took out a loan for up to $2.5 million from Chittenden Bank. (Doc. 75-2 at 1.) This loan represented Anichini's principal debt.

In December 2013, Mr. Tauber, a New York investor, contacted Ms. Dollenmaier after visiting the Quechee store with his wife. (Doc. 75-3 ¶ 14.) Mr. Tauber operates a business called Royal Heritage Home, LLC, which sells consumer products to stores like Walmart and Bed Bath and Beyond. (*Id.* ¶ 15.) During early conversations between Mr. Tauber and Ms. Dollenmaier, Mr. Tauber expressed interest in acquiring the Anichini brand as well as Ms. Dollenmaier's creative talents. (Doc. 74 at 6.)

In January 2014, Mr. Tauber and Ms. Dollenmaier met to discuss how RHH and Anichini might be combined. (Doc. 75-3 ¶15.) To facilitate the potential merger or acquisition, RHH executed a Non-Disclosure Agreement ("NDA"). (*Id.*) The NDA granted RHH and Mr. Tauber access to Anichini's financial information, business plans, and customer and supplier lists. (*Id.*) Anichini furnished RHH and Mr. Tauber with the names and contact information of Anichini customers, designers, and suppliers, as well as the company's financial information for the years 2009 through 2013. (*Id.* ¶ 16.) After the January 2014 meeting, Anichini continued to provide RHH and Mr. Tauber with updated financial information. (*Id.*)

On January 17, 2014, Mr. Tauber emailed Anichini an outline of proposed terms for a potential merger or acquisition between RHH and Anichini. (Doc. 26-2 at 2–3.) Over the course of the next fifteen months, representatives from Anichini and RHH met several times to negotiate terms and work towards a final agreement. (Doc. 75-3 at 3.) On October 3, 2014, Mr. Tauber, on behalf of RHH, emailed Anichini a term sheet detailing specifics of a proposed offer

6

by RHH to acquire Anichini and to employ Ms. Dollenmaier. (Doc. 75-9 at 2–3, 6–8.) Anichini and RHH continued exchanging proposals concerning the terms of their potential merger or acquisition throughout the late winter and early spring of 2015. (Doc. 75-3 at 3; *see e.g.*, Doc. 26-3 at 2–5; Doc. 26-4 at 2–3.)

Mr. Tauber and Ms. Dollenmaier met on or around April 15 and 16, 2015, to discuss their negotiations to date. (Doc. 75 ¶¶ 23–24; *see* Doc. 26-4 at 3.) Based on the conversations that occurred at these meetings, Mr. Tauber drafted a second term sheet which he provided to Anichini. (Doc. 26-5 at 1, 4.) Mr. Tauber confirmed his approval of the term sheet in an email dated April 24, 2015, which he sent to Anichini representative Patricia Reinhardt and Ms. Dollenmaier. (Doc. 26-5 at 2.)

The April 24th term sheet proposes that in exchange for acquiring Anichini, RHH would: (1) assume Anichini's bank debt up to $450,000; (2) provide $425,000 to pay other old debt; (3) assume $625,000 of current accounts payable; (4) pay $250,000 for excess assets, such as excess inventory or security deposits; (5) execute and deliver a Seller's Note for $900,000; and (6) agree to pay a 3% royalty on certain sales. (Doc. 26-5 at 4; Doc. 75-3 ¶ 24.) In the body of the email to which the term sheet is attached, Mr. Tauber wrote: "As far as I'm concerned we have our basic term sheet and concepts agreed to on the WORD doc we created." (Doc. 26-5 at 2.) Mr. Tauber added: "I see no reason why [Ms. Dollenmaier] and I shouldn't get together Monday and start to prep for the final closing." (Doc. 26-5 at 2.)

The parties disagree over the nature of the term sheet attached to the April 24, 2015 email. Ms. Dollenmaier and Anichini argue that the term sheet contains all of the material terms of the Agreement between the parties, and both parties agreed to these material terms and thus, "[a]s of April 24, 2015, there existed a valid, binding, enforceable agreement among RHH,

7

Mr. Tauber, Ms. Dollenmaier and Anichini." (Doc. 75 at 9.) Mr. Tauber and RHH respond that the term sheet and April 24 email were "nothing more than an unenforceable 'agreement to agree.'" (Doc. 67-1 at 9.)

Ms. Dollenmaier, Mr. Tauber, Anichini, and RHH continued to negotiate after April 24. Ms. Dollenmaier and Anichini supplied more financial information to Mr. Tauber and RHH. (*See, e.g.*, Doc. 75-5 at 35–38.) Ms. Dollenmaier also continued to provide Mr. Tauber with information on Anichini's suppliers, customers, and designers. Ms. Dollenmaier introduced Mr. Tauber to Anichini contacts in India and Italy and provided Mr. Tauber with a list of celebrity customers. (Doc. 75-13 at 2–9.)

Between April and July 2015, Ms. Dollenmaier and Mr. Tauber also continued to discuss RHH's commitment to assist with funding for Anichini's purchase orders. On July 8, 2015, Mr. Tauber emailed Ms. Dollenmaier and explained that he and she could develop a funding mechanism for Anichini's business "once the People's [United Bank loan] transaction is complete." (Doc. 75-14 at 4.) On or around July 23, 2015, Mr. Tauber confirmed that he and Ms. Dollenmaier had "a clear understanding" of their business relationship, and stated that creating and editing a new document was unnecessary and would only slow their progress. (Doc. 7, Ex. G at 2.)[3]

That same month, July 2015, Mr. Tauber formed Top Ridge for the purpose of acquiring Anichini's loan with People's. (Doc. 75-3 ¶ 33.) Mr. Tauber is the manager and sole member of Top Ridge. (*Id.*) Top Ridge closed on the purchase of Anichini's loan held by People's on July 28, 2015. (*Id.*)

---

[3] The court notes that Defendants' Opposition to Plaintiff's Motion for Summary Judgment (Doc. 75) states that the July 23, 2015 email is attached as Ex. K to Doc. 75, however, this email is not included in Ex. K. Rather, the court accessed this email through Doc. 7, Ex. G. (*See* Doc. 75 at 7.)

On July 25, 2015, Ms. Dollenmaier and Mr. Tauber exchanged emails that repeated and confirmed the terms of the April 24 email and attached term sheet. (Doc. 26-6 at 2.) The first term included on Ms. Dollenmaier's July 25, 2015 email was that Mr. Tauber would immediately purchase the People's loan from the bank for a 10% discount. (*Id.*) Mr. Tauber would provide funding to settle Anichini's debts with old creditors and fund the company to settle current debts. At that point, the sale of Anichini to Top Ridge, RHH, and Mr. Tauber would be closed. (*Id.*) Mr. Tauber responded that Ms. Dollenmaier's summary of the terms of the agreement "look[ed] good." (*Id.*)

Three days after acquiring the loan, on July 31, 2015, Top Ridge sent Anichini and Ms. Dollenmaier a letter informing them of Top Ridge's acquisition of the loan, and Top Ridge's reservation of rights concerning default and enforcement of the loan agreement. (Doc. 75-3 ¶ 40; Doc. 7, Ex. I at 2–4.) Since that time, Top Ridge has consistently sought to collect on the note and foreclose on the collateral without hiring Ms. Dollenmaier or paying off Anichini's trade debt. Anichini remains in default on the loan and has not made any payments on the promissory note since December 10, 2015. (Doc. 68-1 ¶ 16.) (*Id.*; Doc. 74 at 4.)

## D. Analysis

Viewed in the light most favorable to Anichini and Ms. Dollenmaier, the record evidence supports their claim that RHH, Mr. Tauber, and Top Ridge joined in breaching the contract described in successive term sheets. There is evidence in the exchange of emails that over the course of more than a year of negotiations, both sides expressed their intent to transfer Anichini to RHH in exchange for the repayment of trade debt, the refinancing of bank debt and the creation of a new role for Ms. Dollenmaier. Instead, after acquiring the bank debt, Top Ridge changed its position and sought repayment, and when that was not forthcoming, sought to foreclose on the collateral and enforce the personal guaranty.

9

The parties disagree over whether the term sheets are sufficient to constitute a binding contract. Under Vermont law, and consistent with American contract law generally, contract formation depends upon proof of "a meeting of the minds of the parties: an offer by one of them and an acceptance of such offer by the other. To be valid, an offer must be one which is intended of itself to create a legally binding relationship on acceptance." *Starr Farm Beach Campowners Ass'n, Inc. v. Boylan*, 174 Vt. 503, 505, 811 A.2d 155, 158 (2002) (citations omitted).

In cases in which one party alleges that the contract was formed on the basis of emails and other communications exchanged before execution of a final written agreement, the Vermont Supreme Court has exercised caution in enforcing "agreements to agree." *Miller v. Flegenheimer*, 2016 WL 7183426, No. 2015-448 (Dec. 9, 2016 Vt.) In such cases, determining whether the parties have reached a binding and enforceable agreement "depends on two factors: the parties' intent to be bound and the definiteness of terms in the communications between the parties." *Id.* ¶ 13. The inquiry into the parties' intent is objective—that is, it depends upon consideration of the parties' communications and does not depend upon testimony or other description of their subjective intent. *Id.* ¶ 15 (citing *Evarts v. Forte*, 135 Vt. 306, 310, 376 A.2d 766, 769 (1977) ("It is never enough that the parties think they have made a contract; they must express their subjective intent in a manner that is capable of understanding.").

"Intent to be bound [by contract] is a question of fact." *Catamount Slate Prods., Inc. v. Sheldon*, 2003 VT 112 ¶ 17, 176 Vt. 158, 845 A.2d 324 (2003). "To discern that intent a court must look to the words and deeds of the parties which constitute objective signs in a given set of circumstances." *Bixler v. Bullard*, 172 Vt. 53, 58, 769 A.2d 690, 694 (2001) (internal alterations and quotation marks omitted).

10

In *Catamount Slate*, the Vermont Supreme Court followed the Second Circuit's decision in *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1986), in identifying four criteria which guide the factfinder in determining whether intent is present. These criteria are:

(1) whether there has been an express reservation of the right not to be bound in the absence of a writing;

(2) whether there has been partial performance of the contract;

(3) whether all of the terms of the alleged contract have been agreed upon; and

(4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Catamount Slate*, 2003 VT 112 ¶ 17 (quoting *Winston*, 777 F.2d at 80).

The record evidence relevant to these four factors provides support for a potential jury determination that the parties intended to commit themselves to the acquisition of Anichini on the terms outlined in the term sheet. The first factor (a reservation of the right not to be bound) is not present. Unlike the young legal clerk Guppy in the novel *Bleak House* who prefaced his declarations of love to Esther Summerson with the expression "without prejudice," Mr. Tauber and RHH expressed no such reservation. This is a factor which counts in favor of Anichini and Ms. Dollenmaier's position.

With respect to factor two, there is evidence of partial performance of the alleged "broader agreement" when Top Ridge acquired the People's loan. Purchase of Anichini's bank debt was one of the steps which both term sheets describe in outlining the parties' transaction. There is also evidence that Top Ridge was formed for the sole purpose of facilitating the acquisition of Anichini by RHH.

Factor three —whether all of the terms of the alleged contract were agreed upon—is the factor which is in dispute. The "Agreed Terms" which appear to have been prepared by Mr.

Tauber and forwarded to Ms. Dollenmaier in April 2015 appear to be comprehensive. In an email dated April 24, 2015 to Anichini's business advisor, Mr. Tauber wrote in relevant part:

> I'm glad you connected with Marc Gross [plaintiff's counsel].
>
> As far as I'm concerned we have our basic term sheet and concepts agreed to on the WORD doc we created.
>
> Mark needs to get his arms around the document Terry created and you revised so that I can go start my conversation with People's Bank.
>
> I see no reason why Susan and I shouldn't get together Monday and start to prep for the final closing. It's currently a learning process for me on how Anichini works. We will get this done since I already hugged it out with Susan [Dollenmaier].
>
> I will discuss the principals of this temporary licensing agreement accordingly.

(Doc. 75-12 at 3.) As this email indicates, the parties were in substantial agreement on many issues by April 2015.

The elements comprising the parties' agreement appear in the term sheet document, evidently prepared in April 2015 by Mr. Tauber. The term sheet provides a detailed description of the assumption of the bank debt, RHH's rights to a ten year licensing agreement if the transaction does not close, a cash payment of $425,000 to clear "all old debt," the assumption by RHH of up to $625,000 in current accounts payables, delivery by Anichini of at least $750,000 in inventory or security deposits, a "seller's note for $900,000 payable to Anichini," and a five year employment contract for Ms. Dollenmaier. It also sets out details about fringe benefits, a bonus plan, and auto and health insurance reimbursement. A complete contract would undoubtedly cover additional points and contingencies, but, viewed in the light most favorable to the non-moving party, the term sheet provides a comprehensive summary of material terms.

The fourth factor is whether an agreement to acquire a company such as Anichini is customarily in writing. The answer is obviously yes. This factor favors the position of Top Ridge.

If the court considers these factors in the light most favorable to defendants, it is evident that a jury could decide the case in their favor. In April 2015, following months of negotiation, the parties expressed agreement on the critical terms of their deal. In July 2015, Top Ridge took an important step towards performance when it purchased the bank debt. These undisputed facts satisfy two of the four criteria put forth by *Catamount Slate*. Within a few days, something changed, and Mr. Tauber apparently decided not to complete the transaction outlined in the term sheet and announced his intent to foreclose on the collateral instead.

Mr. Tauber now denies that he formed sufficient intent to bind himself to the terms previously expressed in his emails. "There is simply no agreement to find valid, binding and enforceable." (Doc. 67-1, Memorandum of Law in Support of Third-Party Defendants' Motion to Dismiss, at 10.) He relies upon statements by the parties and their representatives that more drafting and additional documents were required before closing. (*Id.* at 9.) One way to consider whether defendants can establish a binding agreement at trial is to consider a counterfactual. If Anichini's financial prospects had improved sharply after Top Ridge's purchase of the note and security agreements, could Ms. Dollenmaier have brought the payments current, withdrawn from any broader agreement to sell her companies, and settled into a long-term commercial lending relationship with Top Ridge? It seems likely that Top Ridge and Mr. Tauber would have insisted on their right to continue with the acquisition of the Anichini companies based on the same history of negotiations and commitments which defendants point to in opposing the motion for summary judgment.

On this record, it is not possible to grant summary judgment to Top Ridge. There are too many unanswered factual questions about the parties' exchanges, especially during the period

between the high point of what Mr. Tauber described as their "hugged out" relationship in April and his decision to foreclose in July. Among the unanswered factual questions are:

- What oral or written communications occurred after April 2015?

- What terms of the "larger agreement" were not agreed to by April 2015?

- What is the explanation for the subsequent change in direction by Top Ridge?

These and other facts all relate to the issue of whether Anichini and Ms. Dollenmaier can establish through a process of reasonable inference from objective conduct that both sides formed an intent to sell the Anichini companies to Mr. Tauber on the terms outlined in their communications.

In addition to arguing that there is insufficient evidence of a broader agreement, Top Ridge also argues that language in the original documents for the People's loan bars any argument that it is Top Ridge (and Mr. Tauber and RHH) who have broken their promise. (Doc. 68-8 at 9.) Top Ridge directs the court to a standard form requirement in the Security Agreement that any modification of the agreement be in writing. (*Id.* at 11.) Anichini responds that the emails which created the agreement are all in writing and satisfy this provision. (Doc. 75 at 17.) Additionally, since RHH entered into a broad agreement for the acquisition of the Anichini companies before Top Ridge bought the promissory note, RHH necessarily waived or modified its rights under the promissory note and security agreement to the extent necessary to carry out the larger transaction. (*Id.*) In other words, the larger agreement came first. Having bound itself to this larger agreement, Top Ridge cannot point to language in the security documents which it acquired later to avoid its obligations to Anichini.

Again, the nature and terms of the parties' alleged contract presents factual questions for trial. One position which Top Ridge may assert is that any agreement to pay Anichini's debts

14

and to hire Ms. Dollenmaier was later voided by language in the People's loan documents and that both parties intended such a result. In other words, although it might appear to some that RHH was making important commitments in the April 2015 email exchange, these commitments were rendered unenforceable by provisions in loan documents signed by Anichini ten years earlier. That position may be challenging to prove to a jury. But it is not a result that the court can order as a matter of law and on the face of the documents alone.

Top Ridge also directs the court to a sentence in the Security Agreement restricting Anichini's right to assert a setoff or counterclaim against the collateral. (Doc. 68-8 at 11.) The specific language is:

> There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

(Doc. 68-5, at 3.) The sentence does not state that Anichini cannot defend itself against a claim by Top Ridge or assert a counterclaim of its own in response. It only states that Anichini cannot seek to encumber or dilute the collateral by means of such a claim and that it has not done so in the past. Anichini and Ms. Dollenmaier make no claim for a setoff against the collateral. They are presently in possession of it subject to a court order that they can sell it only in the ordinary course of business. This clause has no application unless Anichini makes a claim of its own against the inventory or other collateral.

Finally, Top Ridge points to a sentence in the Security Agreement requiring written notice of an alleged breach of the Security Agreement or "Related Documents." It states:

> Grantor must notify Lender in writing of any breach of this Agreement or the Related Documents by Lender and any other claim, cause of action or offset against Lender within thirty (30) days after the occurrence of such breach or after the accrual of such claim, cause of action or offset. Grantor waives any claim, cause of action or offset for which notice is not given in accordance with this paragraph. Lender is entitled to rely on any failure to give such notice.

(Doc. 68-5 at 7.) This provision requires notice of a violation of the Security Agreement and "Related Documents" which is a defined term encompassing the documents signed by the parties in 2005 in the course of the creation of the loan. (Doc. 68-5 at 22.) It also applies to "any other claim … against Lender." Again, whether the parties formed an enforceable agreement on the basis of the term sheet in April 2015 and whether that agreement was modified several months later by adoption of the terms of a Security Agreement signed in 2005 between the bank and Anichini raises factual questions about what the parties intended to agree to. Anichini was, after all, on notice of the provisions of its own loan documents. Top Ridge is entitled to seek to make the case that even if RHH and Mr. Tauber made promises to Anichini, the parties intended to subject these obligations to the 30 day notice provision in the People's bank loan documents. But the existence of that language in the Security Agreement does not operate as an automatic limitation on the enforcement of promises allegedly exchanged during the spring of 2015.

The court denies Top Ridge's motion for summary judgment on the promissory note and the security documents because there is a factual dispute between the parties over the terms of their contract. It will require fact finding to determine whether the agreement is limited to a secured loan, purchased by Top Ridge and admittedly in default, or whether it encompasses the broader terms which both parties seemed to accept in their exchange of emails and other communications. The boiler-plate provisions in the People's loan documents do not prevent Anichini and Ms. Dollenmaier from raising a defense that it is Top Ridge, RHH and Mr. Tauber who violated the terms of the parties' agreement.

## II.   RHH and Mr. Tauber's Motion to Dismiss Counterclaims

RHH and Mr. Tauber have also filed a motion to dismiss the counterclaims included in the answer filed by Anichini and Ms. Dollenmaier. (Doc. 67.) They seek dismissal of claims for

breach of contract, breach of the implied covenant of good faith, misrepresentation, tortious interference, and breach of fiduciary duty.

The first cause of action is a request for declaratory judgment. Whether the cause is dismissed or goes forward depends upon the five substantive causes of action which follow it.

### A.    Breach of Contract (Count II)

The court denies the motion to dismiss the contract claim for **the same reasons it** denies the motion for summary judgment. Anichini and Ms. Dollenmaier have come forward with plausible allegations against Mr. Tauber and RHH that the Anichini parties are the victims of a breach of an agreement to acquire the Anichini companies in exchange for payment of the companies' debt and the creation of a job for Ms. Dollenmaier. Whether the parties formed an enforceable contract or only an agreement to agree raises factual issues which must be resolved through trial. In addition, the requirement that modifications be in writing and that the borrower may make no claim of its own against the collateral may have little application to this claim since the emails purporting to establish the terms of the larger contract are writings and there is no claim for set-off directed against the collateral.

### B.    Breach of the Implied Covenant (Count III)

Mr. Tauber and RHH seek dismissal of the claim for breach of the implied covenant of good faith and fair dealing on the ground that Anichini and Ms. Dollenmaier have made a claim for breach of express contract which is inconsistent with the implied covenant claim. As a threshold issue, not addressed by the parties, the court must determine whether state or federal law governs the issue of whether pleading in the alternative is permitted. Fed. R. Civ. P. 8(d)(2) provides that:

> A party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party

makes alternative statements, the pleading is sufficient if any one of them is sufficient.

The rule permits a plaintiff to advance two theories of recovery even though they are inconsistent. Under principles expressed in *Sibbach v. Wilson & Co.*, 312 U.S. 1 (1941), and *Hanna v. Plumer*, 380 U.S. 460 (1965), the court considers whether Rule 8(d)(2) is a rule that "really regulates procedure—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." *Sibbach*, 312 U.S. at 14. Because Rule 8(d)(2) only regulates the manner in which claims may be brought before the court and provides no substantive rule of decision, the court concludes that it is procedural in nature. Because it is procedural, it falls within the rulemaking authority conferred by Congress on the Supreme Court through the Rules Enabling Act, 28 U.S.C. § 2072. As a matter of federal procedural law, Rule 8(d)(2) authorizes the filing of claims in the alternative in a diversity case even if state practice differs.

Since Rule 8(d)(2) of the Vermont Rules of Civil Procedure is identical, one might ask why the source of authority makes any difference. The reason is that some confusion has developed over the years among Vermont cases which have considered whether breach of the implied covenant of good faith and fair dealing may be included in a case which also includes an express breach of contract claim. These include diversity cases filed within this District. *Compare One Source Envtl., LLC v. M + W Zander, Inc.*, 13 F. Supp. 3d 350, 362 (D. Vt. 2014) (claim for breach of a contractual obligation to pay commissions could not also "sustain an additional cause of action under the covenant of good faith and fair dealing") *with Harsch Props., Inc. v. Nicholas*, 2007 VT 70, ¶ 14, 182 Vt. 196, 932 A.2d 1045 ("A breach for violation of the implied covenant may form a separate cause of action than for breach of contract, as long as the counts are based on different conduct."). Vermont decisional law permits pleading both

theories of liability so long as each concerns different facts. *See Monahan v. GMAC Mortg. Corp.*, 2005 VT 110 ¶ 62, 179 Vt. 167, 893 A.2d 298 ("For purposes of judging conduct against the standard of good faith and fair dealing, 'implied contractual obligations may coexist with express provisions which seemingly negate them where common expectations or the relationship of the parties as structured by the contract so dictate." (quoting *Wakefield v. Northern Telecom, Inc.*, 769 F.2d 109, 112 (2d Cir. 1985)). Recovery under both theories – which would be an issue of substantive law –is generally disallowed. See *Citibank N.A. v. City of Burlington*, 971 F. Supp. 2d 414, 431 (D. Vt. 2013) (quotations omitted) ("...Vermont courts do not recognize a separate cause of action for violation of the covenant where the plaintiff 'pleads a breach of contract claim based on the same conduct.'") As the *Citibank* case illustrates, dismissal has been the result when the same conduct gives rise to express contract and implied covenant claims.

Recognizing that the federal rules of procedure govern issues of pleading and potential dismissal simplifies the analysis. Federal Rule 8 takes precedence over state law providing a more restrictive practice. *See Olympia Hotels Corp.* v. *Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1371 (7th Cir. 1990) (state common law principles of election of remedies do not apply in diversity case subject to Federal Rules). In formulating its counterclaim, Anichini is not required to pick one theory at the outset of the case and in the absence of discovery and be forever bound to that theory. It is clear that by the end of the case, recovery may be possible on one theory or the other but not on both. That determination may arise in the context of a motion for summary judgment after completion of discovery. It may occur as a matter of deliberate choice by Anichini before trial. It is even possible that the jury will be presented with two alternative bases with an instruction that an award based upon a finding of breach of contract necessarily excludes recovery on the alternative theory. For purposes of considering a motion directed to the

pleadings, this court follows Fed. R. Civ. P. 8(d)(2) which authorizes the filing of inconsistent and alternative theories of recovery.

The court turns to the merits of the claim of breach of the implied covenant. Vermont law has long recognized that some forms of business conduct which may not violate the terms of an express contract may be actionable as violations of the implied covenant of good faith and fear dealing. The covenant of good faith is implied as a matter of law in every contractual relationship. It protects parties to a transaction from treatment which violates community standards of decency and fair play but are not expressly governed by the terms of the contract. In the leading case of *Carmichael v. Adirondack Bottled Gas Corporation*, the Vermont Supreme Court held that the doctrine applied to negotiations between a gas company and the widow of one of its distributors *after* the distribution agreement terminated upon the death of the distributor. 161 Vt. 200, 211, 635 A.2d 1211, 1218 (1993). "The very nature of [the parties'] business relationship contemplated that, after the contract termination, the parties owed each other duties with respect to winding down their affairs as long as the post-termination conduct was related to the contractual relationship." *Id.* at 208. Similar reasoning permits the assertion of the implied covenant claim concerning conduct after the parties have entered into initial agreements but before closing on all aspects of their transaction.

If Top Ridge is right in its claim that the parties failed to reach a binding contractual agreement during the spring of 2015, then the claim of breach of the implied covenant may provide an alternative remedy. The allegations that Mr. Tauber obtained proprietary information about Anichini on the pretext of acquiring the companies on terms favorable to the owner Ms. Dollenmaier and then changed course after purchasing the bank loan and sought to obtain the assets of the company without fulfilling his other promises could provide a factual basis for a

claim of breach of the covenant. The parties were involved in a contractual relationship following execution of the non-disclosure agreement. Their contractual relationship deepened when Top Ridge became in effect Anichini's lender. Conduct by either party in the course of this business relationship may be subject to the implied covenant of good faith and fair dealing.

The motion to dismiss Count III (breach of the implied covenant) is denied.

### C.    Misrepresentation (Count IV)

Anichini and Ms. Dollenmaier have pled a sufficiently specific claim of common law fraud to proceed. They allege that Mr. Tauber misrepresented his true purpose in obtaining access to confidential financial information. (Doc. 26 at 16.) They allege that they relied on his false statements and suffered damages as a consequence. (*Id.* at 17.) In converting the motion to dismiss to a motion for summary judgment, the court opened the record evidence to include the emails and other materials provided by both sides.

Vermont law has long established the elements of a claim of fraud. "To maintain a cause of action for fraud, plaintiff must demonstrate five elements: '(1) intentional misrepresentation of a material fact; (2) that was known to be false when made; (3) that was not open to the defrauded party's knowledge; (4) that the defrauded party act[ed] in reliance on that fact; and (5) is thereby harmed.'" *Felis v. Downs Rachlin Martin* PLLC, 2015 VT 129 ¶ 13, 200 Vt. 465, 133 A.3d 836 (quoting *Estate of Alden v. Dee*, 190 Vt. 401 (2011). Anichini and Ms. Dollenmaier have produced record evidence which, if believed, could meet the requirements of all five elements:

1. Mr. Tauber made false statements concerning his intentions of refinancing Anichini's debt, including trade debt, and hiring Ms. Dollenmaier in an important executive role in the reconstituted company;

2. These statements were material to the transaction and known by him to be false;

3. Ms. Dollenmaier could not have known that Mr. Tauber had no intention of fulfilling his promises, including those preserved in the two term sheets;

4. Ms. Dollenmaier relied on Mr. Tauber's statements and permitted him to examine many confidential aspects of her closely-held business, including financial and banking information;

5. Anichini and Ms. Dollenmaier were harmed when Mr. Tauber made use of the information he obtained to purchase her bank debt and then seek to foreclose on the collateral which represented all assets of Anichini.

Whether Anichini and Ms. Dollenmaier can prove this version of the events is not a question the court answers today. But these allegations, which are supported by record evidence, are sufficient to state a fraud claim. The court denies the motion to dismiss Count IV (Misrepresentation).

### D.     Tortious Interference (Count V)

In a manner similar to the fraud claim, Anichini and Ms. Dollenmaier allege that Mr. Tauber made use of confidential information to contact customers, vendors, and suppliers of Anichini. (Doc. 26 at 17–18.) At paragraphs 27 and 28 of the counterclaim, Anichini and Ms. Dollenmaier allege that Mr. Tauber contacted suppliers and others in order to induce them to cease doing business with Anichini by disclosing information about Anichini's financial straits. (Doc. 26 at 15.) They allege that this conduct was undertaken in bad faith and that Anichini suffered damages through interference with their contractual relations. Mr. Tauber and RHH contend that the claim fails because there is no allegation of the loss of a particular contract or business opportunity. (Doc. 67–1 at 17.)

Tortious interference requires proof that the interference caused the harm alleged which is the refusal of some third-party to do business with the plaintiff. *Gifford v. Sun Data, Inc.*, 165

Vt. 611, 615, 686 A.2d 472, 476 (1996). Anichini and Ms. Dollenmaier are vague on this point. The counterclaim states only that the interference occurred, not whether it was successful. (Doc. 26 at 17–18.) The absence of allegations of actual contracts or customers affected by the alleged interference was specifically raised in the motion to dismiss. (Doc. 67–1 at 12.) In altering the motion to dismiss to a motion for summary judgment, the court allowed an additional response period from the parties. Anichini and Ms. Dollenmaier filed nothing more. The burden was on them to produce record evidence of a particular contractual relationship which was actually damaged due to Mr. Tauber's interfering conduct. *See Gifford*, 165 Vt. at 613 ("... plaintiff must prove that the defendant interfered with business relations existing between the plaintiff and a third party"). Because the element of actual damage to Anichini involving a particular contract or prospective business relationship has not been pled or supplemented with record evidence, the court grants the motion to dismiss with respect to the claim of tortious interference (Count V).

**E.       Breach of Fiduciary Duty (Count VI)**

Anichini and Ms. Dollenmaier offer no allegations sufficient to plead a breach of fiduciary duty. They allege only that Mr. Tauber sought to acquire Anichini through a false show of friendship and concern. The establishment of a fiduciary duty requires a relationship of trust and dependency in which one party places trust and confidence in another to conduct its affairs. *Capital Impact Corp. v. Munro*, 162 Vt. 6, 10, 642 A.2d 1175, 1177 (1992). A borrower-lender relationship is not usually sufficient to create a fiduciary relationship. *McGee v. Vt. Fed. Bank, FSB*, 169 Vt. 529, 726 A.2d 42, 44 (1999) (mem.). Parties negotiating for the sale of a business from one to the other are not often viewed as fiduciaries. *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005) ("Such a relationship, necessarily fact-specific, is grounded in a higher level of trust than normally present in the marketplace between those

involved in arm's length business transactions."). In the absence of any plausible allegation that Mr. Tauber, RHH, or Top Ridge acted on behalf of Anichini in a fiduciary capacity, the court dismisses Count VI (Breach of Fiduciary Duty.)

## Conclusion

Plaintiff's Motion for Summary Judgment (Doc. 68) is DENIED. Third-Party Defendants' Motion to Dismiss (Doc. 67), which the court is treating as a motion for summary judgment, is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to Counts V and VI of the Defendants' Counterclaims (Doc. 26). The motion is DENIED with respects to Counts I – IV.

Dated at Rutland, in the District of Vermont, this 14 day of July, 2017.

Geoffrey W. Crawford, Judge
United States District Court