UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

TOP RIDGE INVESTMENTS, LLC, )
)
    Plaintiff, )
)
v. )   Case No. 5:16-cv-76
)
ANICHINI, INC., ANICHINI )
HOSPITALITY, INC., ANICHINI RETAIL, )
INC., and SUSAN DOLLENMAIER, )
)
    Defendants, )
)
and )
)
ROYAL HERITAGE HOUSE, LLC and )
JEFFREY TAUBER, )
)
    Defendants-in-Counterclaim. )

**DECISION ON MOTION IN LIMINE TO PRECLUDE TESTIMONY
AND REPORT OF DEFENDANTS' PUTATIVE EXPERT TERRY DORMAN
(Doc. 108)**

On October 23, 2017, defendants Anichini, Inc., et al. (collectively "Anichini") disclosed Terry Dorman as an expert witness on the issue of economic damages sustained by defendants as a result of claimed misconduct by plaintiff Top Ridge, Inc. and counterclaim-defendants Jeffrey Tauber and Royal Heritage House, LLC (collectively "Top Ridge").

There is no claim that the disclosure was untimely. It follows the completion of fact depositions in October 2017. The initial disclosure was supplemented by an additional report from Mr. Dorman on November 28, 2017.

Top Ridge seeks to exclude Mr. Dorman's expert testimony on the ground that he has no professional qualifications in the area of economic damages, and that his report is unreliable because it is not based upon a recognized methodology. The court agrees and excludes Mr. Dorman's testimony as an expert. There are, however, areas in which Mr. Dorman may testify as a fact witness, and this decision seeks to clarify the scope of permissible testimony.

1

**Legal Standard**

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which requires a foundational showing that:

- the witness has relevant scientific, technical, or other specialized knowledge;
- the testimony is based on sufficient facts or data;
- the testimony is the product of reliable principles and methods; and
- the expert has reliably applies the principles and methods to the facts.

In performing its function as gatekeeper, the court must make a preliminary inquiry into these issues before the jury may hear the testimony. *See In re Pfizer Inc. Securities Litigation*, 819 F.3d 642, 658 (2d Cir. 2016); *see generally Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

### 1. Mr. Dorman's Qualifications

Mr. Dorman has served as a consultant to Anichini in connection with the proposed acquisition of Anichini by Top Ridge. After graduating from high school in 1974, he founded his own business which he sold in 1987. This business specialized in computer graphics, touch screens and video game controllers. In 1987 he founded a consulting firm specializing in restructuring financially troubled companies. He continues to work in this field. He has no formal education in business, economics, or any other discipline related to economic damages. There is no indication in his biographical disclosure that he has ever published an article, taught a class, obtained a degree, or in any other way demonstrated in a public setting that he has technical or other specialized knowledge. Instead, he has offered a list of companies he has rehabilitated through negotiations with lenders, customers, unions, regulators, and other parties. None of these companies appear to have been in the textile trade.

### 2. Facts Relied Upon By Mr. Dorman

As Anichini's consultant, Mr. Dorman has access to the business records of Anichini. His report demonstrates a competent understanding of Anichini's financial position. He lists the records on which he relied in an exhibit to his report. These include profit and loss statements and records of sales to customers.

### 3. Mr. Dorman's Opinions

In his initial report dated October 23, 2017, Mr. Dorman offers 3 opinions:

- RHH's failure to provide funding resulted in a loss of customers which he values at $283,223.
- RHH's conduct resulted in Anichini's inability to continue to purchase products from Quagliotti, one of its principal suppliers, resulting in a loss of $689,713.
- RHH's insistence that Anichini not reduce overhead costs, coupled with its failure to provide agreed-upon funding, resulted in economic loss of $873,193, representing costs that could have been reduced.

The initial report contained no explanation of how Mr. Dorman arrived at these damage amounts. In his supplemental report, he provides the following information:

- He calculated the value of the lost customers by identifying six customers who stopped doing business with Anichini in late 2015 or early 2016 after Anichini failed to complete an order. He calculated average annual sales for the years 2014 and 2015 (including the cancelled orders). He calculated a gross profit margin of 45% based on Anichini's costs, revenue, and invoices. He applied a "multiplier" of 2.5 to the product of the annual profit and the number of years the customer had done business with Anichini over the last ten years. He determined the "multiplier" based on his "years of experience as a consultant to financially troubled companies, assessing and developing strategies to turn those companies around and advising equity holders and equity funds in such matters."
- He determined the damages associated with the loss of purchases from Quagliotti by comparing the volume of Anichini's sales of Quagliotti's products before and after the date in 2015 when the supplier required cash terms from Anichini. He applied the same 45 percent profit margin to the difference in annual sales of Quagliotti goods for the years 2015 and 2016.
- He determined the loss which he attributed to Anichini's excessive spending on overhead by comparing the rate of spending from late 2014 through early 2016 with the leaner spending rate he had himself proposed to Anichini in January 2015.

3

### 4. Reliability of Methodology

The court will consider the reliability of the methodology used to reach each of the opinions in turn.

#### A. Loss of Customers

This opinion rests on no accepted methodology at all. It is derived from three variables. The first is lost customers. Mr. Dorman discloses no reasons for his conclusion that the six large accounts left Anichini due to Anichini's financial problems. His reports do not indicate that he contacted any of the customers to investigate the reasons why they left. There are countless possible reasons, only one of which is under-capitalization and problems in fulfilling orders on Anichini's end. Other reasons might include changes in the customers' business plans, downturns in the market for fine textiles, and competition.

The second variable is the profit margin. A business with a 45% gross profit margin sells goods for a little less than twice what it bought them for. The margin is gross because it does not account for Anichini's own costs of doing business. Subject to hearing testimony as to Anichini's revenue and cost of goods sold, this variable has a reasonable basis.

The third variable is the multiplier. The court is familiar with multipliers in the context of valuation of businesses. Experts who use these multipliers typically point to economic studies which measure the return on capital which the market demands for various industries and investments. They can also look at the prices at which various businesses are actually sold. But Mr. Dorman relies on no such studies. He states that his own experience indicates that a given account is worth 2.5 times its annual gross profit in 2014 and 2015 discounted by how many years out of the last ten Anichini did business with the customer.

Mr. Dorman's methodologies are highly speculative. They are not backed up by research or publications. He attributes the departure of six customers to Anichini's financial straits without any attempt to determine if that was the real reason for the loss of business. The determination of gross profits is a matter of simple math, given the cost of goods purchased and the price obtained for the same goods from customers. But the real Twilight Zone calculation is the multiplier, which comes from no discernible origins. It serves only to extend the annualized lost profit figure out into the future on an unsubstantiated basis.

4

B. Loss of Quagliotti Product

This calculation is entirely historical in nature. Quagliotti's decision to require cash terms and not to extend credit to Anichini as in previous years is likely to reflect Anichini's problems in paying its bills. Anichini's poor financial condition in 2015 is undisputed. Mr. Dorman serves primarily as a fact witness who is familiar with the volume of sales before and after the change in terms. There is no multiplier which seeks to project these sales past the years 2015 and 2016.

C. Failure to Reduce Costs

Mr. Dorman's claim that if Anichini had implemented his cost savings measures, those costs would have been saved lacks any methodology at all. The relevant calculation is not whether Anichini could have lowered its costs. The relevant calculation is whether Anichini would have had more money at the end of the year if it had followed Mr. Dorman's advice. That calculation requires a sophisticated consideration of the relationship between costs and revenues. Money which is being wasted in a completely unproductive way is saved entirely if that cost is eliminated. But most costs have some benefit to the company. Lay-offs, delays in replacing capital equipment, and other cost savings have results on the income side of the books. Mr. Dorman's simplistic calculation—at least as it is expressed in his first and second reports which are before the court—completely omits any consideration of these problems.

## CONCLUSION

The court **GRANTS** the Motion in Limine to Preclude Testimony and Report of Mr. Dorman as an expert witness (Doc. 108) on the basis both of a lack of professional qualifications and the shortcomings and gaps in his methodology. Mr. Dorman lacks professional education in business or economics. He does not publish. He does not teach. He holds no professional license. He appears to be entirely self-taught. His methodology is derived exclusively from his experience as a business owner and consultant. When he seeks to describe its basis in his report, he refers in the most general terms to his life experience. This is insufficient to meet the standards of Rule 702 and the *Daubert* line of cases, which call for demonstrated expertise in a known field. *See United States v. Williams*, 506 F.3d 151, 162 (2d Cir. 2007) (*Daubert* analysis entails consideration of expert's credentials and methods); *cf. Zaremba v. General Motors Corp.*, 360 F.3d 355, 359–60 (2d Cir. 2004) (expert's "meager qualifications" rendered methodology analysis "almost superfluous").

The court intends no disrespect to Mr. Dorman. His business clients have been many over a long period of time, and they appear to have been well-served. But since, in the courtroom setting at least, he cannot offer a detailed and coherent explanation of the methodology underlying his calculations, he cannot offer expert opinion testimony.

But much of what Mr. Dorman proposes to testify to is not really opinion testimony at all. As a person familiar with the Anichini business, he can testify about his examination of the company's books and records and describe, for example, the average gross margin the company realizes on goods sold. That is a matter of empirical observation, not an opinion. He can identify unnecessary overhead costs. He can testify about the difference in sales volume for Quagliotti products before and after the change in terms. In these respects, his testimony is on par with Susan Dollenmaier's. Both know facts about the Anichini business.

Dated at Rutland, in the District of Vermont, this 30th day of November, 2017.

Geoffrey W. Crawford, Judge
United States District Court